**In the Matter of Roxolana HARASYMIW, Debtor.**

**SELFRELIANCE FEDERAL CREDIT UNION, Plaintiff–Appellee, Cross–Appellant,**

v.

**Roxolana HARASYMIW, Defendant–Appellant, Cross–Appellee.**

Nos. 89–1539, 89–1590.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 25, 1989.

Decided Feb. 14, 1990.

As Amended March 8, 1990.

Elenie Huszagh (argued), and Lauren Newman, Boorstein & Huszagh, Chicago, Ill., for Selfreliance Federal Credit Union.

William Getzoff (argued), Getzoff & Getzoff, Chicago, Ill., for Roxolana Harasymiw.

Before WOOD, JR. and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

When Roxolana Harasymiw filed bankruptcy, among her creditors was the Selfreliance Federal Credit Union ("Selfreliance"). The bankruptcy court ruled that Harasymiw's obligation was nondischargeable either under 11 U.S.C. § 523(a)(2)(B) as a debt incurred through a written material misrepresentation or under 11 U.S.C. § 523(a)(4) as a debt incurred through fraud or defalcation while acting in a fiduciary capacity. The district court found Harasymiw's debt nondischargeable only under the basis of 11 U.S.C. § 523(a)(2)(B). *See Harasymiw v. Selfreliance Fed. Credit Union*, 97 B.R. 924 (N.D.Ill.1989). Harasymiw appeals from the final order of the district court, and Selfreliance has cross-appealed. We agree that Harasymiw became indebted to Selfreliance through a written material misrepresentation. Consequently, we do not decide whether Harasymiw abused a fiduciary relationship owed to Selfreliance.

## I. FACTUAL BACKGROUND

Harasymiw's relationship with Selfreliance began when she worked there on a part-time basis during high school. In April 1977, she became its treasurer, two years after her admittance to the Illinois bar. Harasymiw resigned as treasurer in April 1981 but remained a director of Selfreliance until December 1983. Because of these positions, Selfreliance personnel considered Harasymiw to be credible and a person on whom they could rely for guidance.

In July 1981, Harasymiw approached her successor as treasurer, Bohdan Watral, regarding a possible $150,000 loan for a business venture that she and John Demianczuk wished to pursue. The deal was eventually consummated, with the following properties used as collateral:

| | |
|---|---|
| (1) Assignment of a trust's beneficial interest. The trust owned property located at 917 South Western Avenue in Chicago, Illinois (the "Chicago property"). $267,000 | |
| Less disclosed encumbrances. ($159,000) | |
| Total equity as disclosed by Harasymiw. | $108,000 |
| (2) Equity in unimproved land in Venice, Florida. | $ 20,000 |
| (3) Equity in real estate in Wilmette, Illinois. | $ 50,000 |
| Total collateral as represented by Harasymiw. | $178,000 |

In addition, Demianczuk held a contract for sale of the Chicago property for $267,000. Unbeknownst to Selfreliance, the Chicago property was encumbered by a superior purchase money mortgage in the amount of $128,000, making it valueless as a piece of collateral.

Selfreliance's board of directors approved the Harasymiw loan at a meeting which Harasymiw attended but left during the discussion of her application. For the board to approve a loan, it generally needed evidence that the value of the collateral at least exceeded the amount of the loan—$150,000 in this case. At the time of approval, Selfreliance had a loan policy that provided for the evaluation of loans on a case-by-case basis within the regulations of the National Credit Union Administration. After obtaining board approval, Harasymiw prepared the mortgages for the Wilmette and Florida properties, the assignment of the beneficial trust interest to Selfreliance, and the disbursement voucher for her loan.

Selfreliance retained an independent attorney to review the legal aspects of the Harasymiw loan. As part of this review, Harasymiw provided a title commitment for the Chicago property. The title commitment did not disclose the $128,000 purchase money mortgage, which was recorded three days after the title commitment was issued. From the time of her loan application to disbursement of the loan proceeds, Harasymiw never disclosed the existence of the $128,000 mortgage. This prior encumbrance reduced the value of Harasymiw's collateral package below the $150,000 threshold needed for Selfreliance's approval. The bankruptcy court specifically found that had Selfreliance known of this superior mortgage, it would not have allowed the loan.

On these facts, the bankruptcy court held that Harasymiw's debt to Selfreliance was nondischargeable under 11 U.S.C. § 523(a)(2)(B) as a debt incurred through a material misrepresentation. The credit union was found to have reasonably relied upon Harasymiw's representations. Also, Harasymiw's reckless disregard for the accuracy of her representations was enough to establish a knowing intent to deceive. The district court substantially agreed with the reasoning of the bankruptcy court, adding that $267,000 was a reasonable valuation of the Chicago property. The district court disagreed with the bankruptcy court whether Harasymiw's debt was incurred through fraud while acting in a fiduciary capacity, an issue we need not reach today.

## II. DISCUSSION

Harasymiw attacks the district court's order on three grounds. First, she asserts the district court ignored the value of the

contract for sale of the Chicago property. Second, Harasymiw challenges the district court's $267,000 valuation of the Chicago property as clearly erroneous. Third, Harasymiw asserts that the district court should have applied Selfreliance's loan policy to determine the materiality of her misrepresentation.

Arguing that we can find Harasymiw's debt nondischargeable as a debt incurred through fiduciary malfeasance, Selfreliance has also appealed from the district court's order. Selfreliance's cross-appeal only raises alternative grounds for affirming the district court's decision, rendering the cross-appeal unnecessary. *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir. 1987), *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988). Because we agree that Harasymiw incurred her debt through a material misrepresentation, we do not reach the merits of Selfreliance's cross-appeal. Accordingly, the cross-appeal is dismissed.

The requirements of nondischargeability under 11 U.S.C. § 523(a)(2)(B) can be broken down into six elements:

(1) the debtor must make

(2) with intent to deceive

(3) a materially false

(4) statement in writing

(5) respecting the debtor's or an insider's financial condition

(6) on which the creditor reasonably relied.

The burden is on the creditor, Selfreliance, to establish these six elements by clear and convincing evidence. *In re Bogstad*, 779 F.2d 370, 372 (7th Cir.1983). In this case, Harasymiw challenges whether her statement was materially false and whether Selfreliance reasonably relied on her misrepresentation.

In her materiality argument, Harasymiw uses a "but for" causation or *causa sine qua non* analysis: a misrepresentation is material only if the creditor would not have advanced funds but for the debtor's misrepresentation. Previously, we have noted cases defining materiality under section 523(a)(2)(B) as "an important or substantial untruth" and called the *causa sine qua non* test a "recurring guidepost." *Bogstad*, 779 F.2d at 375. We need not decide today whether a *causa sine qua non* analysis is an essential part of section 523(a)(2)(B)'s materiality element. Harasymiw's appeal is fruitless even using the tougher *causa sine qua non* definition of materiality. We agree with both lower courts that if Selfreliance had known of the undisclosed $128,000 mortgage, it would not have made the loan to Harasymiw.

As her first assigned error, Harasymiw argues we should count the value of the contract for the sale of the Chicago property to a person named Perez. Both lower courts implicitly found that the credit union did not consider the Perez contract as a separate asset when evaluating Harasymiw's loan application. Under Harasymiw's logic, injecting the $133,500 value [1] of the Perez contract into the package of collateral would cover the $128,000 prior mortgage that she failed to disclose.[2] However, adding this amount to the value of Hara-

---

**1.** If Selfreliance had considered the Perez contract as a separate piece of collateral, it would have assigned the contract a value at least equal to $133,500—one-half of its face amount of $267,000. The exact dollar figure is irrelevant so long as we use an amount higher than the $128,000 undisclosed mortgage.

**2.** Using the $133,500 value of the Perez contract as part of Harasymiw's collateral yields the following result:

| | |
|---|---|
| Perez Contract | $133,500 |
| Interest in Chicago Property | $108,000 |
| Less Undisclosed Mortgage | ($128,000) –0– |
| Interest in Florida Property | $ 20,000 |
| Interest in Wilmette Property | $ 50,000 |
| | $203,500 |
| Total Collateral Needed to Approve the Loan | $150,000 |

Thus, adding the value of the Perez contract to Harasymiw's collateral package could arguably render the $128,000 mortgage immaterial. If the credit union counted the Perez contract as a separate asset, it might still have approved the loan even if it had known of the $128,000 mortgage.

symiw's collateral would be an absurd double-counting. While Demianczuk did assign his interest in the Perez contract to Selfreliance and the credit union did consider the Perez contract in its loan decision, these actions were necessary to protect the credit union's interest in the Chicago property. The Perez contract was a contract for sale of the Chicago property, a property that was already part of Harasymiw's collateral. Together, the Perez contract and Demianczuk's equity represent the property's complete value: every payment by Perez reduced Demianczuk's interest. Because any other result would be financially senseless, the bankruptcy and district courts did not err in their implied findings that Selfreliance never treated the value of the Perez contract as a separate piece of collateral.

By attempting to paint the Perez contract as more than just a contract for sale of the Chicago property, Harasymiw acknowledges the flaws in her argument. She asserts that the Perez contract encompassed more than just the sale of land: it also included the repayment of two loans that Perez owed to Demianczuk. We cannot agree with this analysis. The contract itself states that the sales price is $267,000. In addition, Harasymiw fails to explain why Perez would agree to be the purchaser in a contract for sale that required him to pay more than the sales price before the seller would have to transfer title. Even though Demianczuk may have negotiated the repayment of these loans as part of the contract for sale, it is obvious that $267,000 represents the consideration that Perez agreed to pay in return for the Chicago property. No matter what may have gone into making up the $267,000 sales price, our reasoning remains the same.

Harasymiw next takes issue with the credit union's reliance on a figure of $267,000 as the Chicago property's value. For a

debt to be nondischargeable under section 523(a)(2)(B), the creditor's reliance on the debtor's representations must be reasonable.[3] In connection with her loan application, Harasymiw submitted four possible values for the Chicago property: her own estimate of $180,000; a title commitment estimate of $170,000; the Perez contract selling the Chicago property for $267,000; and an insurance appraisal reflecting a value of $269,000. Given these conflicting values, Harasymiw contends Selfreliance should have conducted further research to find the true value of the Chicago property. Our inquiry is not to judge the wisdom of loaning the money to Harasymiw or of valuing the property at $267,000 but only to determine whether the credit union's reliance on the valuations provided by Harasymiw was reasonable. *See In re Garman*, 643 F.2d 1252, 1257–58 (7th Cir.1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981).

In other circumstances, conflicting valuations of collateral might give rise to a duty on the part of a creditor to investigate beyond the face of the financial statements provided by the debtor. To measure the reasonableness of a creditor's reliance, however, we must look at the particular facts and circumstances of any given case. *In re Mullet*, 817 F.2d 677, 679 (10th Cir. 1987). The record in this case establishes that Harasymiw was a trusted, long-time, and high-ranking employee of Selfreliance. This kind of on-going relationship between debtor and creditor can excuse the creditor's failure to verify a financial statement. *Bogstad*, 779 F.2d at 373 n. 4; *see In re Kreps*, 700 F.2d 372, 376 (7th Cir.1983) (debtor was long-time customer of creditor); *Garman*, 643 F.2d at 1259–60 (same); *In re Colton*, 108 B.R. 605 (Bankr.N.D. Ohio 1989) (debtor and creditor had an ongoing social relationship). Thus, cases cit-

---

**3.** Section 523(a)(2)(B) requires reasonable reliance on the debtor's materially false written financial statements. What made Harasymiw's written statements false was her omission of a $128,000 prior encumbrance on the proposed collateral. Section 523(a)(2)(B) arguably requires no more than the credit union's reasonable reliance that an encumbrance of this kind would be disclosed on Harasymiw's financial statements. Nevertheless, Selfreliance did not raise this argument, and the credit union's reasonable reliance on the valuation of the Chicago property is intertwined with the materiality of Harasymiw's omission. Thus, we leave to another opinion to decide the scope of section 523(a)(2)(B)'s reasonable reliance requirement.

ed by Harasymiw where courts have found unreasonable a creditor's failure to investigate a relatively unknown debtor are inapposite. Under the particular circumstances present in this case the credit union could have reasonably relied on any of the valuations given by Harasymiw without extensive inquiry. Selfreliance's choice to accept the higher of these valuations does not ipso facto make its choice unreasonable.

Contrary to the district court's finding, Harasymiw also attempts to show that the credit union actually valued the Chicago property at $180,000. Harasymiw's main contention here is that Selfreliance and Demianczuk agreed in case of default that Selfreliance would attempt to sell the property at an initial price of not less than $200,000. This is weak evidence of Selfreliance's actual valuation. Selfreliance's agreement to $200,000 as an initial sales price in case of default must be viewed in light of the low prices generally received at any forced sale of collateral. Contradicting Harasymiw's assertions is the testimony of Selfreliance's treasurer, Watral, who specifically testified that he relied upon a valuation of at least $260,000 for the Chicago property. Weighing this evidence, the district court correctly concluded that the credit union used a $267,000 valuation for the Chicago property.

Harasymiw next finds fault with the district and bankruptcy court's decisions not to use Selfreliance's loan policy in their findings on materiality. Selfreliance did have a loan policy that called for valuing collateral at only a percentage of the lower of its cost or market value. Harasymiw asserts that if the loan policy is used to evaluate her application, she does not qualify for the loan even with the nondisclosure of the $128,000 mortgage. Thus, she reasons that the nondisclosure is immaterial under Selfreliance's loan policy.

We do not sit as an after-the-fact loan committee, second-guessing lending decisions. *See Garman*, 643 F.2d at 1257–58. The testimony of Selfreliance's employees easily established that the loan policy was only meant as a guideline to be applied on a case-by-case basis. It is enough to observe that because Harasymiw did receive her loan, the loan policy was obviously not rigidly applied to her case. Because Selfreliance did not in fact use the loan policy to evaluate Harasymiw's application, it has no relevance to the inquiry on materiality.

While not relevant to materiality, a creditor's failure to follow its own established lending procedures can preclude reasonable reliance on the debtor's financial information. *See In re Mitchell*, 70 B.R. 524, 527 (Bankr.N.D.Ill.1987). There was no evidence to suggest that Selfreliance failed to follow its own established lending procedures or, more specifically, that the loan policy was an established lending procedure. Instead, both lower courts found that Selfreliance's loan policy was not "fixed in stone" and that business loans were dealt with on a "case-by-case basis." We cannot overturn these factual findings absent clear error. *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985). Two employees of the credit union testified as to the loan policy's informal nature, providing more than ample evidence to buttress the lower courts' findings.

Now that she has her loan, Harasymiw also complains that by failing to strictly apply the loan policy, Selfreliance gave her preferential treatment, which would be inherently unreasonable under regulations of the National Credit Union Administration. For there to be preferential treatment Harasymiw must have been given a loan on more favorable terms than someone else. There is no evidence, however, to indicate that Selfreliance would have rigidly applied the loan policy to a nonemployee presenting a similar loan application. Harasymiw's cry of preferential treatment rings hollow.

## III. CONCLUSION

Selfreliance reasonably relied on Harasymiw's representations. Furthermore, Harasymiw's failure to mention the $128,000 mortgage made her financial statements materially false. Therefore, we affirm the judgment of the district court denying Harasymiw a discharge under section 523(a)(2)(B) for her debt to Selfreli-

ance. The unnecessary cross-appeal of Selfreliance is dismissed. As the prevailing party, Selfreliance is entitled to recover its costs.

AFFIRMED.