**In re Andre S. BAILEY, Debtor.**

**COMMUNITY BANK of HOMEWOOD– FLOSSMOOR, Plaintiff,**

v.

**Andre S. Bailey, Defendant.**

**Bankruptcy No. 89 B 21425.
Adv. No. 90 A 0341.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Sept. 15, 1992.

---

Cynthia G. Swiger, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for plaintiff.

Daniel P. Dawson, Nisen & Elliott, Chicago, Ill., for debtor, defendant.

## MEMORANDUM, OPINION AND ORDER

ROBERT E. GINSBERG, Bankruptcy Judge.

This matter is before the court on the motion of the Debtor, Andre S. Bailey, the Debtor, for judgment on partial findings pursuant to Fed.R.Civ.P. 52(c), made applicable to this adversary proceeding by Fed. R.Bankr.P. 7052, with regard to an adversary proceeding brought against the Debtor by Community Bank of Homewood–Flossmoor. In this proceeding, the Bank seeks to: (1) block the Debtor's discharge under Bankruptcy Code §§ 727(a)(2), 727(a)(3), 727(a)(4), or 727(a)(5); or, (2) in the alternative, to have its claim against

the Debtor declared nondischargeable under § 523(a)(2)(B). For the reasons stated below, this court rules that the Bank has produced sufficient evidence to allow the court to rule that should the Debtor fail to rebut the Bank's evidence, the court, on the record now before it, would hold that: (1) the Debtor is not entitled to discharge under § 727(a); and (2) the Bank's claim should be declared nondischargeable under § 523(a)(2)(B). This court thus denies the Debtor's motion and requires the Debtor to proceed with his defense.

### FACTS [1]

The Debtor had two related businesses, The Fox Company, a seafood distributor, and Pro Fish Enterprises, a gourmet seafood delicatessen. In early 1988, the Debtor sought loans from the Bank for Fox Company and Pro Fish. As was its policy with all such closely held corporations, the Bank demanded a personal guaranty from the Debtor on any such loans. In addition, to be able to measure the significance of that guaranty, the Bank required the Debtor to provide a personal financial statement for himself and his wife, which the Debtor furnished the Bank in March of 1988. That financial statement showed the Debtor with a net worth of $961,760. The statement valued the Debtor's home at $660,000 and listed $175,000 of jewelry, antiques and furnishings. It did not indicate that there were any mechanic's liens on the Debtor's residence. The Bank reviewed the Debtor's business history as well as the Debtor's personal financial statements and approved: (1) a $50,000 loan to Pro Fish on March 14, 1988; (2) a $150,000 loan to Fox Company on May 12, 1988; (3) a $100,000 letter of credit to Fox Company on May 17, 1988; and (4) a $15,000 loan to Pro–Fish on July 7, 1988. In the fall of 1988, the letter of credit was replaced by a $150,000 line of credit to Fox Company, and the two loans to Pro–Fish were renewed.

In May of 1989, the Debtor submitted a second written personal financial statement to the Bank. This statement listed the Debtor's net worth at $1,285,248. The statement valued the Debtor's home at $990,000, and listed $195,000 of jewelry, antiques, and other personal property. This statement also did not mention any mechanic's lien on the residence.

Shortly after receiving this second personal financial statement, the Bank renewed the Fox Company loan in the amount of $100,000. The Debtor also entered into Check Credit agreements, i.e. overdraft agreements, with the Bank, for Pro Fish and himself (jointly with his wife). An attempted refinancing of these loans in September 1990 was never consummated. As of December 1989, the Debtor owed the Bank approximately $281,000 on all of the various loan and credit agreements. All of the loans were unsecured.

During 1989, both Fox Company and Pro Fish failed. The Debtor filed a petition under Chapter 7 of the Bankruptcy Code on December 19, 1989. The Debtor did not dispute the Bank's claim for $281,000. However, in listing his assets in the bankruptcy schedules, the Debtor valued his home at $400,000 and listed only $2,500 of personal property. In addition, the Debtor scheduled a mechanic's lien claim in the amount of $460,000 against the Debtor's residence which the Debtor maintains is owed to Fox Real Estate, a company owned by his father-in-law, Mr. Edward Fox. This alleged mechanic's lien resulted from a massive reconstruction of the Debtor's residence that allegedly began in early 1986 and continued up to the time of the petition.[2] Furthermore, the Debtor did not schedule another alleged mechanic's lien claim that surfaced in his bankruptcy case, that of another of his father-in-law's businesses, Fox Automobile Company, against

---

**1.** Obviously, with an interlocutory motion before it, the court cannot make findings of fact without the Debtor being afforded an opportunity to put on his defense. The statement of facts in this opinion is what the court would find if no further evidence was forthcoming.

**2.** Of course, if Fox Real Estate has and can foreclose a lien of such magnitude against the home, Fox Real Estate will wind up with title to the home. Obviously, no matter what Mr. Fox may think of this son-in-law, he is unlikely to evict his daughter and grandchildren. The validity of the mechanic's lien is being challenged by the Bank in a separate adversary proceeding.

the Debtor's Corvette. Finally, the Debtor failed to disclose the recent sale of his boat on the Statement of Financial Affairs and his ownership interest in certain stock and interest in certain office equipment on his bankruptcy schedules.

On May 22, 1990, the Bank filed a complaint seeking to have: (1) the Debtor be denied a discharge pursuant to § 727(a)(2)(A), § 727(a)(3), § 727(a)(4), and § 727(a)(5); or, in the alternative, (2) the Bank's claim declared nondischargeable pursuant to § 523(a)(2)(B). After a very lengthy trial at which the Bank presented its case, the Debtor filed the instant motion seeking judgment on partial findings in favor of the Debtor.

## JURISDICTION AND PROCEDURE

This court has jurisdiction over this matter under 28 U.S.C. § 1334(b) as a matter arising under §§ 523 and 727 of the Bankruptcy Code. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J) and is before the court pursuant to Local Rule 2.33 of the United States District Court for the Northern District of Illinois referring bankruptcy cases and proceedings to this court for hearing and determination.

## STANDARD FOR RULE 52(c) MOTION

Fed.R.Civ.P. 52(c) provides that a court may grant a motion for judgment on partial findings on any cause of action upon a showing by the movant that the nonmoving party has failed to prove the cause of action. Fed.R.Bankr.P. 7052 applies Fed.R.Civ.P. 52(c) to adversary proceedings. A Rule 52(c) motion should be granted if the plaintiff does not make out a prima facie case on a cause of action. *Alfred Ekanem v. Health and Hospital Corp.*, 724 F.2d 563, 568 (7th Cir.1983), *cert. denied*, 469 U.S. 821, 105 S.Ct. 93, 83

L.Ed.2d 40 (1984) (applying Rule 41(b), the predecessor to Rule 52(c)); *Bugg v. Int'l Union of Allied Indus. Workers*, 674 F.2d 595, 598 (7th Cir.1982), *cert. denied*, 459 U.S. 805, 103 S.Ct. 29, 74 L.Ed.2d 43 (same). To make out a prima facie case under § 727(a) and § 523(a)(2)(B) causes of action, the Bank must show each element of the appropriate cause of action by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).[3] Thus, this court must grant the Debtor's motion for judgment on partial findings with respect to any of the Bank's § 727(a) or § 523(a)(2)(B) objections if the Bank failed to prove any element of the appropriate objection by a preponderance of the evidence.

## DISCUSSION

As a general rule, an individual Chapter 7 debtor receives a discharge that discharges all of the debtor's prepetition debts. § 727(a), (b). However, as with any general rule, there are exceptions. Two exceptions are relevant here. First, an individual Chapter 7 debtor may be denied a discharge of all of his or her debts under the grounds specified in § 727(a). Second, even if a Chapter 7 debtor gets a discharge, specific debts may be excepted from the discharge. *See* §§ 523(a), 727(b).

In this case, the Bank alleges that several grounds exist for refusing the Debtor a discharge under § 727. Furthermore, the Bank argues that, even if the Debtor is entitled to a discharge, its debt should be declared nondischargeable pursuant to § 523(a)(2)(B). The Debtor, of course, argues that the Bank failed to prove its § 727 or § 523(a)(2)(B) claims by a preponderance of the evidence.

---

**3.** In *Grogan,* the Supreme Court held that the preponderance standard was the appropriate standard for § 523(a) actions. The *Grogan* decision would appear to extend to § 727(a) actions as well, since the Court's decision was based on the rationale that the preponderance standard should apply in bankruptcy proceedings unless the Bankruptcy Code states otherwise. *Id.* at ——–——, 111 S.Ct. at 659–60. *See Matter of*

*Beaubouef,* 966 F.2d 174, 178 (5th Cir.1992) (§ 727(a)(4)(A)) case); *In re Serafini,* 938 F.2d 1156, 1157 (10th Cir.1991) (§ 727(a)(2) case); *In re Lawler,* 141 B.R. 425, 429 (9th Cir. BAP 1992) (§ 727 in general). Even if the appropriate standard for § 727(a) actions were clear and convincing evidence, however, this court's ruling with respect to the instant motion would not change in any respect.

## I. *Discharge—§ 727*

The Bank alleges four grounds for denying the Debtor a discharge. First, the Bank claims that the Debtor failed to produce adequate books and records and thus should be denied a discharge under § 727(a)(3). Second, the Bank contends that the Debtor has failed to satisfactorily explain what happened to his apparently extensive assets and, therefore, he should be denied discharge under § 727(a)(5). Third, the Bank claims that the Debtor transferred property with the intent to defraud his creditors within one year of the filing of the bankruptcy petition and thus should be denied a discharge under § 727(a)(2). Finally, the Bank accuses the Debtor of filing false schedules and statements and otherwise lying under oath, thus leading to a denial of discharge under § 727(a)(4).

The Debtor argues that the Bank has failed to prove by a preponderance of the evidence that he should be denied a discharge on any grounds. This court disagrees.

### A. § 727(a)(3)

Section 727(a)(3) provides that discharge must be denied if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure was justified under all of the circumstances of the case ...

11 U.S.C. § 727(a)(3).

■ Under § 727(a)(3), a debtor may not be granted a discharge if the debtor's financial records do not enable the court to evaluate the debtor's current financial condition and reconstruct the debtor's business transactions for a reasonable period of time "with substantial completeness and accuracy." *In re Potter*, 88 B.R. 843, 848 (Bankr. N.D.Ill.1988); *In re Calisoff*, 92 B.R. 346, 356 (Bankr.N.D.Ill.1988). The completeness and accuracy of a debtor's records is to be determined on a case-by-case basis,

considering the size and complexity of the debtor's business. *Potter*, 88 B.R. at 848; *In re Martin*, 124 B.R. 542, 543 (Bankr. N.D.Ind.1991). Such a case-by-case inquiry need not consider whether the debtor intended to defraud the plaintiff; intent is not an element of a § 727(a)(3) objection to discharge. *Potter*, 88 B.R. at 848.

■ The plaintiff has the burden of proving the inadequacy of a debtor's records. *Calisoff*, 92 B.R. at 356. However, once the plaintiff has shown that the debtor's records are inadequate, the burden shifts to the debtor to prove that the failure to keep adequate records was justified under the circumstances. *In re Goldstein*, 123 B.R. 514, 523 (Bankr.E.D.Pa.1991).

■ In this case, given the size and complexity of the Debtor's businesses, the Bank has shown that the records produced by the Debtor thus far are wholly inadequate. The Debtor claims that he has provided the Bank with "seven large boxes of documents as well as other varied items." *See* Memorandum in Support of Debtor's Motion at 21. However, it is quality, not quantity, that is relevant to the § 727(a)(3) inquiry. The Debtor has not produced the 1986–1989 general ledgers for Fox Company, the 1988–1989 general ledgers for Pro Fish, or any bank statements or cancelled checks from 1986–1988 for the Debtor, Fox Company, or Pro Fish. The general ledgers, bank statements and cancelled checks are the very records the trustee and creditors need to be able to reconstruct the Debtor's financial dealings "with substantial completeness and accuracy." Thus, the records produced by the Debtor thus far are clearly inadequate for purposes of § 727(a)(3). Since the Debtor has failed to offer any excuse for his inability to produce records from which his financial condition and business transactions can be reconstructed, the Bank has proven its § 727(a)(3) objection by a preponderance of the evidence.

### B. § 727(a)(5)

Section 727(a)(5) provides that the court must deny a debtor a discharge if:

the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities ...

11 U.S.C. § 727(a)(5).

Under § 727(a)(5), discharge must be denied if the debtor fails to satisfactorily explain any loss of assets or deficiency of assets to meet the debtor's liabilities. *Potter*, 88 B.R. at 849. What constitutes a "satisfactory" explanation for § 727(a)(5) purposes is left to the discretion of the court. *In re Baum*, 359 F.2d 811, 814 (7th Cir.1966); *Potter*, 88 B.R. at 849. *See also In re Chalik*, 748 F.2d 616, 619 (11th Cir. 1984). This court has previously noted, however, that the debtor's explanation must consist of more than a vague, indefinite and uncorroborated hodgepodge of financial transactions. *Potter*, 88 B.R. at 849 (citing *In re Delancey*, 58 B.R. 762, 769 (Bankr.S.D.N.Y.1986)). Instead, "it must be a good faith explanation of what really happened to the assets in question." *Id.*

The creditor has the initial burden of identifying the assets in question by showing that the debtor at one time had the assets but they are no longer available for the debtor's creditors. *Id.* (citing *In re Savel*, 29 B.R. 854, 856 (Bankr.S.D.Fla. 1983)). However, once the creditor has shown by a preponderance of the evidence the disappearance of substantial assets, the burden shifts to the debtor to explain satisfactorily the losses or deficiencies. *In re Martin*, 698 F.2d 883, 887–888 (7th Cir. 1983); *Potter*, 88 B.R. at 849.

In this case, the Bank has met its initial burden. The Debtor's financial statement of May 1989 values the Debtor's net worth at $1,083,248. However, the Debtor's bankruptcy schedules and Statement of Affairs states that, on December 19, 1989, the debtor had a negative net worth of $589,754.98. Thus, the Bank has shown that the Debtor somehow managed to lose more than $1.6 million in the seven months prior to his bankruptcy petition.

In addition, the Debtor's personal property (and that of his wife), including antiques and jewelry, had declined more than 98% in value. The fate of the Corvette was inadequately explained in terms of accidents, insurance proceeds, and Fox Auto's mechanic's lien claim. Finally, not only had the value of the Debtor's home declined almost 50%, but that home was not the subject of a previously undisclosed mechanic's lien in favor of a business owned by his father-in-law.

Consequently, the burden shifted to the Debtor to satisfactorily explain the losses and deficiencies. To date, the Debtor has failed to provide sufficient oral or written evidence to adequately explain how he went from millionaire to pauper in seven months. Instead, the Debtor's explanation has consisted of nothing more than a vague, indefinite and uncorroborated hodgepodge of financial transactions. *See Potter*, 88 B.R. at 849. At this point in the trial, this court has little idea how the Debtor managed to lose more than $1.6 million dollars in the seven months prior to the bankruptcy petition. Antiques the Debtor once said to be of great value are now claimed to have been sold as scrap at a garage sale where no records were kept. There is even less evidence about what happened to the jewelry and other personal property, or how the value of his house declined by more than $500,000 in seven months. Thus, the Debtor has failed to satisfactorily explain his losses.

Thus, the Bank has met its prima facie burden of showing unexplained large losses and deficiencies in assets. The Debtor has not sufficiently explained his losses and deficiencies. Thus, the Bank has proven its § 727(a)(5) objection by a preponderance of the evidence.

## C. § 727(a)(2)(A) and § 727(a)(4)(A)

A debtor will be denied a discharge if: (2) the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed—

926

(A) property of the debtor, within one year before the filing of the petition
...

11 U.S.C. § 727(a)(2)(A).

Under § 727(a)(2)(A), a debtor will be denied a discharge if: (1) the debtor transferred property; (2) belonging to the debtor; (3) within one year of the filing of the petition;[4] (4) with the intent to hinder, delay, or defraud a creditor or officer of the estate. *Matter of Chastant*, 873 F.2d 89, 90 (5th Cir.1989). The objecting creditor has the burden of proving each element by a preponderance of the evidence. *Id* at 90–91; *see Garner*, 498 U.S. at ——, 111 S.Ct. at 659.

In addition, § 727(a)(4)(A) provides that the court may not grant a debtor a discharge if:

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account ...

11 U.S.C. § 727(a)(4)(A).

■ Under § 727(a)(4)(A), a plaintiff must establish five elements: (1) the debtor made a statement under oath; (2) such statement was false; (3) the debtor knew such statement was false; (4) the debtor made such statement with the intent to deceive; (5) and the statement related materially to the bankruptcy case. *In re Arcuri*, 116 B.R. 873, 880 (Bankr.S.D.N.Y. 1990). Whether the debtor made a false oath within the meaning of § 727(a)(4)(A) is a question of fact. *In re Bernard*, 99 B.R. 563, 570 (Bankr.S.D.N.Y.1989). The burden of proof is, of course, on the creditor to establish that the debtor made a false oath by a preponderance of the evidence. *In re Sapru*, 127 B.R. 306, 314 (Bankr.E.D.N.Y. 1991); *see Garner*, 498 U.S. at ——, 111 S.Ct. at 659.

(1) Fox Real Estate's mechanic's lien

■ The Bank argues that, on the record as it now stands, the Debtor must be found to have violated either § 727(a)(2) or § 727(a)(4)(A) in connection with Fox Real Estate's alleged mechanic's lien against his house. If the mechanic's lien really exists, it plus the existing mortgage would, conveniently enough, exhaust much, if not all, of the Debtor's equity in the home.

The Bank says that either the Debtor knew of the mechanic's lien claim that his father-in-law would perfect shortly before the bankruptcy filing and hid that fact from the Bank and his other creditors or, once it became clear that the Debtor would have to file bankruptcy, the Debtor and his father-in-law concocted the mechanic's lien in an effort to keep the home away from his bankruptcy trustee and his creditors. The irony is that the record more than adequately supports both of these mutually exclusive theories.[5]

The Debtor's May 1989 financial statement given to the Bank does not mention a mechanic's lien against the home. Yet, a mere four months later, on September 26, 1989, Fox Real Estate recorded a mechanic's lien of $460,000 against the home, less than three months before the Debtor had filed his Chapter 7 petition. It is, of course, the perfection of the lien that is the date of transfer for fraudulent conveyance purposes. *Compare* § 548(d). Even if Fox Real Estate gave value for the mechanic's lien (which, as explained below, is quite doubtful), if the Debtor and his father-in-law conspired to hide the mechanic's lien from his creditors, the transfer at perfection would be a transfer made within one year before his Chapter 7 petition done with actual intent to defraud creditors.

■ Actual intent is required under § 727(a)(2); constructive intent will not suffice. *See In re Devers*, 759 F.2d 751, 753 (9th Cir.1985). However, because debtors rarely leave direct evidence of their actual intent to defraud their creditors, courts have long examined the facts and circum-

**4.** The Bank does not claim that the Debtor transferred or concealed property of the estate at any time after he filed his Chapter 7 petition. Therefore, § 727(a)(2)(B) is not in issue in this proceeding.

**5.** The theories are mutually exclusive because, if the Fox Real Estate claim is fraudulent, the Bank can show a § 727(a)(4)(A) claim, but cannot show a § 727(a)(2) objection, since there would be no "transfer of property."

stances surrounding a transaction to determine the debtor's intent. *Twyne's Case,* 3 Co.Rep. 80b, 76 Eng.Rep. 809 (1601). *See also Chastant,* 873 F.2d at 90; *Devers,* 759 F.2d at 753; *Farmers Co-op Ass'n v. Strunk,* 671 F.2d 391, 395 (10th Cir.1982). In the search for actual intent to defraud for purposes of § 727(a)(2), it is relevant that property is transferred by the Debtor to relatives. *Chastant,* 873 F.2d at 91; *In re Butler,* 38 B.R. 884, 888 (Bankr.D.Kan. 1984); *Matter of Loeber,* 12 B.R. 669, 675 (Bankr.D.N.J.1981). *See also People ex rel. Hartigan v. Anderson,* 232 Ill.App.3d 273, 173 Ill.Dec. 852, 597 N.E.2d 826 (3 Dist.1992). While the fact that a transfer is to a relative is not in and of itself sufficient to lead a court to find actual fraud, such a transfer, in conjunction with other circumstances, can support a finding of actual fraud, notwithstanding an absence of hard evidence of fraud. *Chastant,* 873 F.2d at 91.

Here, Fox Real Estate, which is owned by the Debtor's father-in-law, Mr. Edward Fox, asserts a mechanic's lien against the Debtor's home. That home could have produced a significant dividend for the Debtor's creditors. In effect, the perfection of the mechanic's lien caused a transfer of all of the Debtor's assets without reservation for necessities. Despite the transfer, the Debtor and his family remain in possession of the home. The mechanic's lien was perfected at a time when the Debtor, a sophisticated businessperson, had to know the deterioration in his financial situation was serious and bankruptcy was a real possibility. Thus, a significant number of badges of fraud identified in *Twyne's Case* have been proved by the Bank by a preponderance of the evidence, and, if no further evidence is adduced, the Debtor will be found to have schemed with his father-in-law to work an actual fraudulent transfer on the Debtor's creditors within a year before his Chapter 7 petition. Accordingly, if the Debtor fails to disprove the facts established by the Bank in this regard, he will be denied a discharge under § 727(a)(2).

On the other hand, the evidence points more strongly to the conclusion that the mechanic's lien was concocted out of whole cloth. The Fox Real Estate records with respect to the reconstruction are chaotic, erratic, disorganized, and wholly inadequate to support a mechanic's lien of this magnitude. The records of the Debtor's wife's uncle, Mr. Joseph Fox, who was responsible for providing the labor for the reconstruction, were similarly inadequate to establish the amount of any claim for labor he might have. The lack of records leads to the conclusion that the debtor's father-in-law and uncle intended the reconstruction of the home to be a gift to the Debtor and his wife. The mechanic's lien was an afterthought; a transparent device to save the home.

[redacted] The Court finds additional support for this view of the alleged mechanic's lien in the fact that after the Debtor's father-in-law was found to have perjured himself with respect to the mechanic's lien of Fox Auto in the Debtor's Corvette, he refused to testify further in this or other proceedings in this Chapter 7 case on Fifth Amendment grounds. In civil proceedings, the finder of fact is permitted to draw inferences from a witnesses' refusal to testify on Fifth Amendment grounds. *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976). Here, the refusal of the Debtor's father-in-law to testify on Fifth Amendment grounds leads the court to conclude, based on a preponderance of the evidence, that that refusal stems from the fact that he and his son-in-law concocted a scheme to pursue a fraudulent mechanic's lien claim in his bankruptcy case in order to save the home.

Here, the Debtor, by including the fraudulent mechanic's lien claim in his schedules and supporting that claim with his testimony in various proceedings, including this one, was guilty of both intentionally making a false oath with respect to a matter that is obviously material, and intentionally advancing a false claim. Thus, if no further evidence is brought forward by the Debtor in this regard, the Debtor will be denied a discharge under § 727(a)(4). *See Arcuri,* 116 B.R. at 880; *In re Krich,* 97 B.R. 919, 922–923 (Bankr.N.D.Ill.1988).

(2) Additional § 727(a)(4)(A) objections

The Bank also claims that, wholly apart from the Debtor's false oaths in support of Fox Real Estate's fraudulent mechanic's lien claim on the Debtor's residence, the Debtor should be denied a discharge under § 727(a)(4) for various other false statements under oath by him in this case. To sustain a § 727(a)(4)(A) objection, the Bank must show that the debtor: (1) made a fraudulent statement under oath with the specific intent to deceive; (2) with respect to a material fact. *In re Montgomery*, 86 B.R. 948, 956 (Bankr.N.D.Ind.1988). As previously noted in this opinion, direct evidence of fraudulent intent is rarely available. Thus, the Court may deny a discharge to the debtor under § 727(a)(4) where fraudulent intent may be inferred in light of the specific facts and circumstances of the case before the court. *See Arcuri*, 116 B.R. at 883. The cumulative effect of a number of false oaths by the debtor with respect to a variety of matters establishes a pattern of reckless and cavalier disregard for the truth by the debtor. *Calisoff*, 92 B.R. at 355; *Krich*, 97 B.R. at 923; *Montgomery*, 86 B.R. at 957.

The Bank points to a large number of instances of alleged false oaths by the Debtor throughout this bankruptcy proceeding, including:

(1) Inconsistent testimony by the Debtor regarding the author of the schedules and Statement of Affairs filed with the bankruptcy petition;

(2) Failure to disclose the sale within one year prior to the bankruptcy petition of a residence in France that the Debtor inherited;

(3) Evasive explanations with respect to the disposition of certain personal property (including jewelry, antiques, and furnishings) at the Debtor's Rule 2004 examination, including specifically a specious claim under oath that many of these items were disposed of at a garage sale by his mother-in-law, who kept no records of the sale;

(4) Failure to disclose the sale of certain antiques in the Statement of Financial Affairs;

(5) Failure to disclose the sale of the Debtor's boat in the Statement of Financial Affairs;

(6) Failure to disclose to the Bank that two major pieces of business equipment were sold to Jonathan's Restaurant, not Agate as the Debtor implied;

(7) Failure to disclose in his bankruptcy schedules that the Debtor retained an interest in certain office equipment;

(8) Failure to disclose in his bankruptcy schedules the ownership of stock held in Fox Company and El Pollo Esad;

(9) Supporting by his testimony the existence of a possessory mechanic's lien claim on the Debtor's Corvette in favor of Fox Auto, a business owned by the Debtor's father-in-law, when it was clear that the Debtor knew his father-in-law had returned possession of the automobile to him;

(10) Failure to identify the alleged mechanic's lien claim against the Debtor's Corvette in his Statement of Financial Affairs;

(11) Fraudulent undervaluation of the Debtor's Corvette in the bankruptcy schedules;

(12) Fraudulent undervaluation of the Debtor's residence in the bankruptcy schedules and fraudulent overvaluation of the remaining repairs to be done on the Debtor's residence; and

(13) Failure to identify the mechanic's lien claim in the Debtor's residence as a joint debt with the Debtor's wife.

■ While a number of these allegations are nonmeritorious or just plain frivolous,[6] and while for the most part each of

---

**6.** For example, the Bank obviously knew the Debtor owned the stock of El Pollo Asad and the Fox Company. The Bank also knows that the stock is valueless. While it is true that the Debtor should have scheduled the stock and allowed the trustee to evaluate its worth, *see Matter of Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992), it is clear there was nothing nefarious about the Debtor's failure to schedule the stock. By the same token, the Debtor's boat was hardly a yacht. Its omission from the Statement of Affairs was immaterial, since the sale itself has never been questioned. Furthermore, the suggestion that the failure to schedule the alleged

the alleged false statements would not in and of itself be material enough to justify a denial of discharge for a false oath under § 727(a)(4), when viewed collectively, the cumulative effect of these falsehoods clearly establishes a pattern of reckless indifference to the truth by the Debtor.

In addition, when taken together, the misstatements are material, and raise serious doubts about the accuracy of the Debtor's schedules and statements on an overall basis. For example, the Bank has shown by a preponderance of the evidence that the Debtor's failure to make full disclosure with respect to the Corvette was not mere oversight. The Debtor claimed the Corvette had been damaged in three accidents. However, particularly with respect to the last two accidents, the Debtor's testimony with respect to insurance, police reports, and identity of the other drivers was inadequate. When coupled with the fact that the Debtor's father-in-law perjured himself in pursuing the alleged mechanic's lien against the Corvette in favor of one of his businesses, the Debtor's omissions and misstatements in the schedule no longer appear innocent and innocuous. Instead, the preponderance of the evidence leads to the conclusion that the Debtor's false oaths in that regard were material and meant to lead the trustee and court into allowing Fox Auto's mechanic's lien claim against the Corvette, despite the fact that the Debtor knew that Fox Auto had released the Corvette into his possession and control after completing the work on the car.

The cumulative effect of these falsehoods clearly establishes a pattern of reckless indifference to the truth by the Debtor in his schedules and Statement of Affairs. The Bank has proved this pattern of reckless indifference to the truth in the schedules and Statement of Financial Affairs by a preponderance of the evidence. Unless the Debtor can show that he truly believed the schedules and Statement of Financial Affairs to be accurate when he signed them under oath or that any shortcomings

in the schedules and Statement of Financial Affairs were inadvertent and immaterial, he will be denied a discharge under § 727(a)(4). *See Calisoff,* 92 B.R. at 355.

## II. *Dischargeability of the Bank's Claim—§ 523(a)(2)(B)*

The Bank also sought to prove that even if the Debtor gets a discharge in this Chapter 7 case, the debt the Debtor owes it should not be included in that discharge because the Debtor obtained the loan from the Bank by using a false financial statement. The operative provision the Bank relies on is § 523(a)(2)(B), which makes nondischargeable in a Chapter 7 case a debt obtained:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with the intent to deceive ...

11 U.S.C. § 523(a)(2)(B).

Under § 523(a)(2)(B), a creditor may have the debt owed to it declared nondischargeable if: (1) the debtor makes (2) a statement in writing (3) respecting the debtor's or an insider's financial condition; (4) which statement is materially false, (5) is made with the intent to deceive, and (6) is reasonably relied on by the creditor. *Matter of Harasymiw,* 895 F.2d 1170, 1172 (7th Cir.1990). The burden is on the creditor to establish these six elements by a preponderance of the evidence. *Id; see Grogan,* 498 U.S. at ——, 111 S.Ct. at 659.

In this case, the Debtor sought and obtained several business loans for Fox Com-

mechanic's lien on the house as a joint debt with his wife was meant to further a conspiracy to pursue allowance of a fraudulent mechanic's lien borders on the frivolous. The home was

jointly owned. Therefore, joint liability was obvious. Finally, the Bank has failed to show that the Debtor ever owned or inherited real property in France.

pany and Pro–Fish. The Bank requested a guaranty of all such loans from the Debtor and his spouse and, to that end, requested written personal financial statements from the Debtor and his spouse. The Bank claims that the personal financial statements supplied by the Debtor were fraudulent, and that it relied on those personal financial statements in making the decision to grant the Debtor his loans.

There is no dispute that the personal financial statements the Debtor submitted to the Bank constitute (1) a statement by the Debtor (2) in writing (3) respecting the Debtor's financial condition. Thus, the focus of the dispute between the parties is on whether the statements were materially false, whether the Debtor issued the statements with intent to deceive the Bank, and whether the Bank reasonably relied on those statements in granting the loans to Pro Fish and Fox Company. On the record before it, this court finds the Bank has established all three issues by a fair preponderance of the evidence.

### A. Material falsity

■ A statement is materially false for purposes of § 523(a)(2)(B) if it "paints a substantially untruthful picture of a financial conditions by misrepresenting information of the type which would normally affect the decision to grant credit."[7] *Matter of Jordan*, 927 F.2d 221, 223 (5th Cir.1991). It is well-established that writings with pertinent omissions may qualify as materially false for purposes of § 523(a)(2)(B). *Id.*

■ Under this test, the Bank has shown that the Debtor's personal financial statements were materially false. The Debtor presented the Bank with personal financial statements showing his net worth

in March 1988 of $819,360 and in May 1989 of $1,083,248. There can be no doubt that the financial statements the Debtor gave the Bank were replete with false information. For example, in the May 1989 financial statement, the Debtor valued his house at $990,000. Some seven months later, when the Debtor filed his Chapter 7 petition, he valued the home at $400,000. It is inconceivable that the Debtor's home decreased in value by more than fifty percent in seven months. The appraisal evidence introduced during trial indicates a value for the home in August 1989 well below the value used by the Debtor in his financial statement.[8]

By the same token, if the antiques, jewelry and other personalty were actually worth the $175,000 the Debtor claimed in the May 1989 financial statement, it is inconceivable that the Debtor would have allowed most of those items of personalty to be sold at a garage sale conducted by his mother-in-law. While the failure of his mother-in-law to keep records at that garage sale, conveniently for the Debtor, makes it impossible to determine exactly what was sold and what was received for the personalty in question, the testimony makes it clear that the garage sale did not produce anything remotely approaching the $175,000 the Debtor claimed the personalty was worth in his May 1989 financial statement. Since the Debtor now claims to have antiques, jewelry and other personalty of only $2,500, it would appear that most of the personalty in question was sold at the garage sale.

When called as a witness by the Bank, the Debtor could offer no credible evidence to support the values he assigned to the house and personalty in the financial state-

---

7. The Seventh Circuit has not yet decided whether the "substantial untruth" approach to materiality under § 523(a)(2)(B) enunciated in *Jordan* and many other cases is more appropriate than a "but for" approach. *See Harasymiw*, 895 F.2d at 1172 (noting the dispute but refusing to reach the issue); *Matter of Bogstad*, 779 F.2d 370, 375 (7th Cir.1985) (citing to cases using "substantial untruth" approach while noting that the "but for" approach is a "recurring guidepost"). Even if the court were to use the harsher "but for" analysis in determining wheth-

er the financial statements the Debtor submitted to the Bank were materially false, the result would be the same. For example, the testimony of the Bank's loan committee members (*see* infra) proves that the Bank would not have made the loans at issue had it known of the existence of a substantial mechanic's lien on the Debtor's residence.

8. That appraisal indicated a value of $825,000, well below the Debtor's $990,000.

ments he submitted to the Bank. He offered no appraisal evidence that was available to him in May 1989. He offered no inventory of the personalty he valued at $175,000 in May 1989. It appears he simply made up the value of his principal assets out of whole cloth.

On the liability side, the most glaring omission is, of course, the Debtor's failure to mention the alleged Fox Real Estate mechanic's lien claim of $460,000 against his house. Indeed, the May 1989 financial statement fails to mention any liability for the reconstruction. Even if the mechanic's lien claim is disallowed as fraudulent, Fox Real Estate would have a substantial unsecured claim against the Debtor for the reconstruction.

Thus, the May 1989 financial statement grossly overvalues the Debtor's principal assets and completely omits his largest debt. Under any test, the financial statement is materially false. The May 1989 statement was substantially, indeed overwhelmingly, untrue.[9] Had the Bank known the Debtor's true financial situation in May 1989 (or March 1988), the court would not have had to devote the considerable time and attention this proceeding has required, because the Bank would not have made the loans at issue.

**B. Intent to deceive**

■ Under § 523(a)(2)(B), a creditor need not show that the debtor had actual knowledge of the falsity of financial information provided to the creditor. Rather, a creditor can establish the requisite intent to deceive upon a showing of either actual knowledge of the falsity of the statement or reckless indifference to or reckless disregard for the accuracy of the information in the financial statement of a debtor. *Matter of Garman*, 643 F.2d 1252, 1260–1261 (7th Cir.1980); *North Community Bank v.*

*Boumenot*, 106 B.R. 149, 153 (N.D.Ill. 1989). Once the creditor establishes the requisite intent to deceive, the debtor may not overcome the inference with merely an unsupported assertion of honest intent. *In re Jones*, 88 B.R. 899, 903 (Bankr.E.D.Wis. 1988). *See also In re Aste*, 129 B.R. 1012, 1018 (Bankr.D.Utah 1991) (same).

■ In his March 1988 personal financial statement, the Debtor valued his residence at $650,000 and his jewelry, antiques, and furnishings at $175,000. In his May 1989 personal financial statement, the Debtor valued his home at $990,000 and his jewelry, antiques, and other personal property at $195,000. However, in his bankruptcy schedules prepared just seven months after the Debtor gave the Bank the May 1989 personal financial statement, the Debtor valued his residence at only $400,000 and his personal property at only $2,500.

The Bank has satisfied its burden of showing that the Debtor gave the Bank a false financial statement in order to deceive the bank in connection with financing of its businesses, or, at a minimum, that he was totally reckless in preparing his May 1989 financial statement. A house, barring some catastrophe, cannot be worth $990,000 in May and worth $400,000 in December. Personalty worth $175,000 in May cannot be sold (except to the extent of $2,500) at a garage sale which yielded little, if anything, by way of proceeds for the Debtor. The Debtor is an experienced businessperson; he had to know that regardless of whether Fox Real Estate had a valid mechanic's lien, he owed Fox Real Estate a large sum of money for the reconstruction. The omission of that debt from his financial statement can only have been done with the intent to deceive the Bank or total recklessness. *See Garman*, 643 F.2d

---

**9.** Because the court finds the May 1989 financial statement is materially false, the Court need not determine at this interim stage of the proceeding whether the Pro Fish or Fox Company statements given to the Bank in connection with the loans in question were also materially false. Of course, the Debtor is an insider with respect to the two business entities. *See* § 101(31).

The March 1988 financial statement is clearly materially false. While significantly less generous in overvaluing assets, the failure to disclose the Debtor's largest debt renders it materially false.

at 1260 (omissions in several financial statements justify finding of recklessness).

## C. Reasonable reliance

In order to have its debt found nondischargeable under § 523(a)(2)(B), the Bank must establish by a fair preponderance of the evidence that: (1) the Bank in fact relied on the Debtor's false financial statements in making loans or giving credit to the Debtor; and (2) that the Bank's reliance was reasonable.

■ Proving reasonable reliance on the financial statements submitted by the debtor is clearly the most difficult hurdle the Bank must overcome to have its debt determined to be nondischargeable. The Bank's problems in this regard are complicated by the misconduct of one of its lending officers, Robert Slowinski. Slowinski was, at one time, the loan officer assigned to handle the Debtor's file. There can be no doubt whatsoever that Slowinski forged the Debtor's initials (and the Debtor's wife initials as well) on some of the 1989 loan documents and backdated those documents, in order to enhance the Debtor's chances of the loan being approved. Furthermore, in this proceeding, Slowinski clearly perjured himself by denying altering the documents in questions. A handwriting expert left little doubt about who was telling the truth about the documents in question. As a result of Slowinski's perjury, this court gives no weight whatsoever to Slowinski's testimony.

At a hearing in this proceeding, this court indicated that Slowinski's behavior tainted and indeed threatened to destroy the Bank's credibility as well. *See* Transcript pp. 1298–99. Had the Bank's credibility been destroyed, it would have been unable to prove reliance. However, this court gave the Bank an opportunity to "salvage" its shaky credibility. *Id.*

The Bank presented three separate members of the committee which reviewed the Debtor's original loan applications. Each member testified that he clearly remembered relying on the Debtor's guaranty and substantial net worth as indicated by his personal financial statements in approving the loans at issue.[10] *See* Testimony of Fred Mansfield, August 19, 1991, pp. 620–25; Robert Field, August 20, 1991, pp. 919–25; Chris Damiano, August 20, 1991, pp. 1004–13. Despite the fact that an important Bank witness perjured himself, this court finds the loan committee members' testimony to be trustworthy and reliable. That testimony is sufficient for the Bank to establish by a preponderance of the evidence that it did in fact rely on the Debtor's personal financial statements in making and renewing the loans in question.

The more difficult question is whether the Bank's reliance was reasonable. In answering that question, it is important to keep in mind that "we do not sit as an after-the-fact loan committee, second guessing lending decisions." *Harasymiw*, 895 F.2d at 1174.

Among the facts the court considers relevant in measuring the reasonableness of the Bank's reliance is the fact that the evidence shows the Bank followed its lending procedures in its dealings with the Debtor and his businesses. *See Harasymiw*, 895 F.2d at 1174 (refusal to overturn lower court's decision based on the plaintiff's compliance with its establishing lending procedures). While it might be argued that the Bank should have verified the value the Debtor assigned to his home in his financial statements—his overwhelmingly largest asset—by obtaining an appraisal, the failure of the Bank to verify the information was "not so unreasonable" as to justify a finding that there was no reliance, especially in light of the past business history between the Debtor and the Bank. *See Matter of Garman*, 643 F.2d 1252, 1259 (7th Cir.1980). In fact, this might be a case of the bigger the lie, the greater its effectiveness. By literally misrepresenting to the Bank that he was a millionaire, the Debtor lulled the Bank into a false sense of security in making and renewing loans that

**10.** Another bank officer also testified that he relied on the Debtor's personal financial statement in renewing the loans. *See* Testimony of Thomas Dockweiler, August 21, 1992, pp. 829–31.

were a small fraction of the Debtor's alleged net worth.

Thus, the Bank has proven every element of its § 523(a)(2)(B) claim by a preponderance of the evidence.

## C. Sanctions for perjury

 The Debtor argues that the Bank's entire complaint should be dismissed as a sanction against the Bank for Mr. Slowinski's forgery and perjury. The bankruptcy court is a court of equity and has broad equitable powers under § 105. Assuming (but without deciding) that this court has the power to impose such a sanction, such a sanction would be wholly inappropriate in the facts and circumstances of this proceeding. Slowinski's backdating of documents and forgery of the initials of the Debtor and his wife was not intended to injure the Debtor. It was meant to deceive the Bank's loan committee, and, indeed, it worked. The Debtor got his loan approved, although he subsequently did not go through with the refinancing. Thus, the Bank, not the Debtor and his wife, was the victim of Slowinski's misconduct. Then, at trial, when Slowinski realized he would lose his job, he lied.[11] There is no evidence the Bank or its lawyers knew Slowinski would perjure himself.

This court reminds the Debtor that those who live in glass houses (even extensively renovated glass houses) should not throw stones. This is a case in which a witness offered by *both* the Debtor and the Bank have been caught presenting perjured testimony. To sanction only the Bank would be unthinkable.

This court believes the proper person to be sanctioned for Slowinski's perjury is Slowinski. Therefore, this court will report Mr. Slowinski's behavior to the United States Attorneys' office for possible prosecution. *See* 18 U.S.C. § 3057.[12]

## CONCLUSION

For the reasons stated above, this court concludes that the Bank has proven its § 727(a) and § 523(a)(2)(B) objections by a preponderance of the evidence. This court thus denies the Debtor's motion for judgment on partial findings under Rule 52(c). Trial in this proceeding will resume with the Debtor's defense on November 2, 1992.

**11.** Slowinski's fears were apparently well-founded. At one point during the trial, counsel for the Bank informed the court that Slowinski was no longer with the Bank.

**12.** Of course, the Court will also advise the U.S. Attorney of Edward Fox's perjured testimony with respect to the alleged mechanic's lien on the Debtor's Corvette.