In re Robert J. RODI, Debtor.

BOMBARDIER CAPITAL,
INC., Appellee,

v.

Robert J. RODI, Appellant.

No. 93 C 4109.
Bankruptcy Nos. 92 B 3293, 92 A 723.

United States District Court,
N.D. Illinois, E.D.

Feb. 1, 1994.

Timothy Joseph McGonegle, Maxwell & Perlstein, Chicago, IL, for debtor/appellant.

David Michael Neff and Rachel R. Schulman, Jenner & Block, Chicago, IL, for appellee.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Bombardier Capital, Inc. ("Bombardier") brought an action against Robert J. Rodi ("Rodi") seeking to have Rodi's debt declared nondischargeable under 11 U.S.C. §§ 523(a)(2) of the Bankruptcy Code. At the conclusion of a bench trial, the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, found that the debt was nondischargeable under subsections (A) and (B) of § 523(a)(2), and on May 17, 1993, entered a judgment against Rodi in the amount of $146,835.21 plus interest. On June 2, 1992 the bankruptcy court denied Rodi's motion to amend its findings in accord with Federal Rule of Civil Procedure 52(b), as adopted in Federal Rule of Bankruptcy Procedure 7052. The case is before this court on Rodi's appeal of the findings of fact and conclusions of law made by the bankruptcy court at trial.[1] Upon review of the record on appeal, the court affirms the bankruptcy court's trial decision and judgment.

### Background

Rodi was president and director of an Illinois boat dealership known as Lighthouse Marine. Soon after Lighthouse Marine began operations in October 1989, the company purchased the assets of the Howdy Marine Company, which included a boat showroom and repair department in Fox Lake, Illinois.

In order to obtain financing for Lighthouse Marine, Rodi prepared a personal financial statement in February 1990. Specifically, Rodi was seeking "floor plan financing." (Trial Transcript "Tr." 34). Rodi's personal financial statement listed his net worth at over $7 million. The largest portion of Rodi's net worth was his 88% interest in

---

1. Twenty-eight U.S.C. § 158 provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals from final judg-

Rodi Properties, listed as worth $6,050,000.[2] Rodi signed his financial statement and included the following boldface statement above his signature: **"Each undersigned represents and warrants that the information provided is true and correct and that you may consider this statement as continuing to be true and correct until written notice of a change is given to you by the undersigned."** (Defendant's Exhibit "Def.'s Ex." 5).

In March 1990, a manager at Lighthouse Marine contacted William Hebert, Jr. ("Hebert"), a regional sales manager at Bombardier, about the possibility of obtaining floor plan financing from Bombardier. In the retail boat selling industry, floor plan financing occurs when a lending institution loans money to a dealer for the purchase of boats and then is repaid from the proceeds of the subsequent sale of the boats. Lighthouse Marine submitted its initial application for financing in late March. The application was signed by two representatives of Lighthouse Marine, but not by Rodi.

Hebert performed Bombardier's customary credit review procedures on Lighthouse Marine's application for financing, including credit checks of the company and its officers, verifications of material financial data, and an inquiry with the state incorporation agency. After performing the review, Bombardier refused the requested $500,000 line of credit, citing Lighthouse Marine's apparent lack of financial ability to support the credit line. Accordingly, Bombardier asked Lighthouse Marine to back up its request with some additional net worth, specifically, the personal guarantee of Rodi. In addition, Bombardier requested that Rodi personally sign the application for financing.

Rodi signed a new application for financing and submitted his personal financial statement in May 1990. At Bombardier's request, Rodi also verified his 88% ownership interest in Rodi Properties and provided an appraisal of the largest property held by Rodi Properties. The application for financing contained the following representations by Rodi:

[ (1) ] There is no lawsuit, proceeding, investigation or claim pending or threatened against the Applicant (Lighthouse Marine) before any court, administrative agency or arbitrator which might materially and adversely affect the Applicant's business or financial condition.

[ (2) ] There is no fact known to the Applicant which the Applicant has not disclosed to Bombardier Capital Inc. which materially and adversely affects, or in the future could reasonably be expected to materially and adversely affect, the Applicant's assets, properties, liabilities, business, results of operations, condition (financial or otherwise), prospects or ability to perform any agreement between the Applicant and Bombardier Capital Inc.

(Plaintiff's Exhibit "Pl.'s Ex." 16). Based on the new application and Rodi's personal guarantee, Bombardier approved the $500,000 floor plan financing.[3]

Despite the above written representations, Rodi failed to inform Bombardier of two facts. First, soon after Lighthouse Marine's commencement of operations, the Fox Lake mortgage holder, Society Bank, had brought a foreclosure suit against Lighthouse Marine. Rodi had an attorney file an appearance in this action on Lighthouse Marine's behalf. Second, when Rodi prepared his personal financial statement in February 1990, he intended on transferring his $6,050,000 interest in Rodi Properties to his family. Bombardier's agents testified that they would not have approved the request for financing if they had known about either one of these facts.

In May 1990, less than a month after signing the application for financing, Rodi transferred his interest in Rodi Properties to

---

ments, orders, and decrees ... of bankruptcy judges...." 28 U.S.C. § 158.

2. The primary asset owned by Rodi Properties was a building and land located at 2550 South Ashland Avenue in Chicago, Illinois.

3. John Mahaffey ("Mahaffey"), the national sales manager for Bombardier, approved Lighthouse Marine's request after reviewing the information provided by Rodi and the information included in Hebert's summary of his own review of the application materials.

his wife and children for no consideration. The following month, Bombardier informed Lighthouse Marine that it was in default under their agreement, as Lighthouse Marine had failed to make $53,622 in payments. In November 1990, the United States District Court for the Northern District of Illinois entered an order requiring Lighthouse Marine to deliver its unsold inventory to Bombardier. The court also entered an order against Rodi for the deficiency plus attorney's fees and costs, in the amount of $146,835.21 plus interest. In February 1992 Rodi filed a petition for bankruptcy under Chapter 7 of the Bankruptcy Code.

### Discussion

Bombardier sought to have Rodi's debt declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (B).[4] The bankruptcy court found that Rodi's debt was nondischargeable under both Sub-sections (A) and (B). Rodi challenges the bankruptcy court's legal conclusions and factual findings.[5] First, Rodi argues that the bankruptcy court incorrectly imposed an irrebuttable presumption that voluntary transfers to family members during a period of financial difficulty amount to fraud on creditors. Second, Rodi argues that the bankruptcy court committed clear error in finding (a) that Rodi made a materially false statement, (b) that Rodi made the misstatement with intent to deceive, and (c) that Bombardier reasonably relied on Rodi's statements. Since the finding of fraudulent misrepresentation focuses on Rodi's statements in writing, the court will first evaluate Rodi's arguments as they apply to Sub-section (B).

### Irrebuttable Presumption of Fraud

"The requirements of nondischargeability under 11 U.S.C. § 523(a)(2)(B) can be broken

down into six elements: (1) the debtor must make (2) with intent to deceive (3) a materially false (4) statement in writing (5) respecting the debtor's or an insider's financial condition (6) on which the creditor reasonably relied." *Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw )*, 895 F.2d 1170, 1172 (7th Cir.1990). The creditor must prove each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Rodi first argues that the bankruptcy court erred as a matter of law in imposing an irrebuttable presumption of fraudulent deceit against Rodi, instead of making independent findings of fact as to each of the above legal elements.

Specifically, Rodi contends that once the bankruptcy court found that Rodi made a voluntary transfer of assets to his family members, the court imposed an irrebuttable presumption that this transfer was tantamount to fraud within the meaning of § 523. In support of his conclusion, Rodi reasons as follows: (1) The Bankruptcy Code looks to state law regarding fraudulent conveyances. (2) The bankruptcy court incorrectly applied the Illinois "fraud in fact" doctrine rather than the Illinois "fraud in law" doctrine to the facts of this case. (3) This incorrect application of the "fraud in fact" doctrine imposed a presumption of fraudulent intent upon Rodi that he could not rebut. (4) Therefore, the bankruptcy court committed an error as to a matter of law. (*See* Rodi's Brief "R. Br." 10–14). The court finds that Rodi's argument is without merit.

■ Rodi's initial premise—that the Bankruptcy Code looks to state law regarding fraudulent conveyances—is mistaken. As courts have repeatedly held, "[n]on-dischargeability due to fraud is a federal ques-

---

**4.** Under 11 U.S.C. § 523(a)(2) a debtor may not discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ... [or] (B) use of a statement in writing ... (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive...." 11 U.S.C. § 523(a)(2).

**5.** The court will not set aside the factual findings of the bankruptcy court unless these findings are clearly erroneous. *In re Hilligoss*, 849 F.2d 280, 281 (7th Cir.1988). However, the court will review all legal conclusions of the bankruptcy court *de novo*. *Id.*

tion, therefore a federal rather than a state definition of fraud is to be used." *Rishell v. Davis* (*In re Davis*), 115 B.R. 346, 349 (Bankr.N.D.Fla.1990); *see also Merchants Nat'l Bank & Trust v. Pappas* (*In re Pappas*), 661 F.2d 82, 86 (7th Cir.1981) ("Bankruptcy Court has exclusive jurisdiction to determine the meaning of false pretenses and false representations, without having to look to ... state law...."); *Baranski v. Lagrotteria* (*In re Lagrotteria*), 42 B.R. 864, 866 (Bankr.N.D.Ill., E.D.1984) (finding that "dischargeability determinations under sections 523(a)(2) ... are exclusively matters of federal law"). Furthermore, a review of the trial transcripts reveals that the bankruptcy court did not apply an irrebuttable presumption of fraudulent intent. In his statement at the end of trial, Judge James made no mention of a presumption of fraudulent intent. (*See* Tr. 396–401).

Rather, Judge James carefully outlined the bankruptcy court's findings of fact as to each of the legal elements of § 523(a)(2)(B). First, the bankruptcy court found that Rodi made statements in writing. (Tr. 400). Second, the bankruptcy court found that the statements were materially false respecting Rodi's and Lighthouse Marine's financial condition. (Tr. 399–400). Specifically, the bankruptcy court found that Rodi made a statement that there was no lawsuit, proceeding, investigation or claim pending against Lighthouse Marine, when in fact there was a lawsuit pending against the company. (Tr. 399). Moreover, the bankruptcy court found that Rodi made a statement that he would inform Bombardier of any transfer of assets listed in the statement, when in fact he failed to notify Bombardier of the transfer of his interest in Rodi Properties to his family. (Tr. 397). Third, considering that Rodi

transferred his interest in Lighthouse to his wife within one month of making these statements, the bankruptcy court found that Rodi made these statements with, at the very least, a "reckless disregard of the truth" that was tantamount to an "intent to deceive." (Tr. 400). Finally, the bankruptcy court found that Bombardier investigated "many of the materials that were set forth in the various statements of Mr. Rodi," and concluded that this amounted to reasonable reliance by Bombardier on those statements. (Tr. 400).

■ Despite the bankruptcy court's findings and conclusions above, Rodi maintains that during the bankruptcy court's consideration of Rodi's motion to amend, Judge James revealed that the bankruptcy court actually applied an irrebuttable presumption of fraud at trial.[6] The court finds that this argument is also without merit.

The bankruptcy court heard argument on Rodi's motion to amend in accord with Federal Rule of Civil Procedure 52(b). (Mot. Tr. 2–3). This rule provides that, "[u]pon motion of a party made not later than 10 days after entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly." Fed. R.Civ.P. 52(b). The purpose of this motion is to correct errors of law and fact and, sometimes, to present newly discovered evidence. *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir.1986) (citing *Evans, Inc. v. Tiffany & Co.*, 416 F.Supp. 224, 244 (N.D.Ill.1976)).

The comments made by the bankruptcy court during oral argument on the motion to amend are somewhat unclear. During oral argument, Judge James did refer to a "presumption" that one could "never" rebut.

---

**6.** In support, Rodi cites the following exchange between his attorney and Judge James:

THE COURT: I think a transfer to a family member is sufficient intent. That's the whole idea. That it's up. Once that family relationship is established, I think under the case law of which I'm aware and can't throw any citations out to you, it becomes the duty of the person who made the transfer, in this case Mr. Rodi, to show that he did not have that intent. There is a presumption that there was an improper intent when you have creditors out there— ...

MR. MCGONEGLE: My concern is how a debtor, in good faith, assuming arguendo in good faith, could possibly overcome the presumption your Honor has placed on him.
THE COURT: I think it's there. He can never. He has to treat his creditors fairly, and he can't say well, I have had this plan. I'm going to do this. There may be factual basis that he has done this for many years, but he does it with the risk that he is not being fair to his creditors. (Motion to Amend Transcript "Mot. Tr." 8–10).

(Mot. Tr. 10). However, he also referred to a presumption that Rodi could rebut.[7] More importantly though, at the conclusion of oral argument, the bankruptcy court *clearly denied Rodi's motion to amend* any of the findings of fact or conclusions of law. (Mot. Tr. 26). Therefore, the comments made by Judge James during oral argument on the motion to amend do not alter the findings of fact and conclusions of law made at trial. In sum, because at trial the bankruptcy court made findings of fact as to each of the legal elements of § 523(a)(2)(B) and later denied Rodi's motion to amend any of these findings, this court finds that the bankruptcy court did not erroneously apply an irrebuttable presumption of fraud.

### Materially False Statements

Rodi's next argument is that the bankruptcy court committed clear error in finding that Rodi made materially false statements. Rather than challenge the bankruptcy court's finding of materiality, Rodi simply argues that his statements were not false. In reviewing this factual finding of the bankruptcy court, the court will apply the clearly erroneous standard.[8]

It is undisputed that Rodi signed an application for financing that contained the following representations:

  [ (1) ]  There is no lawsuit, proceeding, investigation or claim pending or threatened against the Applicant (Lighthouse Marine) before any court, administrative agency or arbitrator which might materially and adversely affect the Applicant's business or financial condition. (Statement One)

  [ (2) ]  There is no fact known to the Applicant which the Applicant has not disclosed to Bombardier Capital Inc. which

materially and adversely affects, or in the future could reasonably be expected to materially and adversely affect, the Applicant's assets, properties, liabilities, business, results of operations, condition (financial or otherwise), prospects or ability to perform any agreement between the Applicant and Bombardier Capital Inc. (Statement Two)

(Pl.'s Ex. 16). In addition, the personal financial statement that Rodi submitted contained the following representation:

  [ (3) ]  Each undersigned represents and warrants that the information provided is true and correct and that you may consider this statement as continuing to be true and correct until written notice of a change is given to you by the undersigned. (Statement Three)

(Def.'s Ex. 5).

Statement One in the financing application is false because Lighthouse Marine did in fact have a lawsuit pending against it. Rodi testified that he was aware that Society Bank had filed a mortgage foreclosure suit against the affiliated Marine companies— Lighthouse Marine, Howdy Marine, and Rodi Marine—in November 1989. (Tr. 30). Rodi also knew that his attorneys had filed an appearance in the foreclosure action on behalf of the companies. (Tr. 31). However, Rodi did not disclose this foreclosure suit to Bombardier. (Tr. 157). In light of these facts, the bankruptcy court made a plausible finding that Lighthouse Marine made a false statement in the application for financing.

Rodi argues, however, that this statement cannot be construed as false under § 523(a)(2)(B) because it was made respecting Lighthouse Marine's condition, not

---

**7.** Earlier during the proceedings Judge James and Rodi's attorney made the following comments:

MR. MCGONEGLE: [I]f your honor is determining as matter of law that Mr. Rodi's transfer to family members in and of itself shows intent, we're allowed to rebut that.
THE COURT: That's right. (Mot. Tr. 9).

**8.** A factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake

has been committed." *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). "If the [bankruptcy court's] account of the evidence is plausible in light of the record viewed in its entirety, [the court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511.

Rodi's. In making this argument, Rodi ignores the plain language of § 523(a)(2)(B). Section 523(a)(2)(B)(ii) states that a debt is nondischargeable if a false statement is made "respecting the debtor's *or an insider's* financial condition." 11 U.S.C. § 523(a)(2)(B)(ii) (emphasis added). An "insider" is defined as a "corporation of which the debtor is a director, officer or person in control." 11 U.S.C. § 101(31)(A)(iv). Since Rodi is the director and president of Lighthouse Marine, this statement respecting Lighthouse Marine's condition is actionable under § 523(a)(2)(B).

■ Statement Two is also false because Rodi failed to disclose his intent to transfer his interest in Rodi Properties. *See generally Harasymiw*, 895 F.2d at 1173 n. 3 ("What made [debtor's] written statements false was *her omission* of a ... prior encumbrance on the proposed collateral.") (emphasis added). Rodi testified that, at the time he submitted the application for financing, he had an intent to convey his 88% interest in Rodi Properties to his wife and children. (Tr. 102). Rodi failed to disclose this intent to Bombardier, despite his representation that there was no fact known to him that he had *not* disclosed to Bombardier which "could reasonably be expected to materially and adversely affect ..." his financial condition. (Pl.'s Ex. 16). The following month Rodi transferred his 88% interest in Rodi Properties, which he had valued at $6,050,000, to his wife and children. (Stipulation "S." 16). In light of these facts, the bankruptcy court made a plausible finding that Rodi made a false statement in the application for financing.

■ With respect to Statement Three, the bankruptcy court additionally found that the financial statement included a false statement. Rodi represented that Bombardier

could "consider [the financial] statement as continuing to be true and correct until written notice of a change [was] given to [it] by [Rodi]." (Def.'s Ex. 5). As noted above, the largest asset listed in Rodi's financial statement was his $6,050,000 interest in Rodi Properties, which amounted to approximately 85 percent of his stated net worth. (Def.'s Ex. 5). Rodi transferred this interest in Rodi Properties to his wife and children in May 1990. (S. 16) However, Rodi failed to notify Bombardier of this transfer until, at the very earliest, December 1990.[9] Since, prior to making this representation to Bombardier, Rodi had formed an intent to transfer this asset to his family, and subsequently he failed to inform Bombardier of the transfer, this continuing statement of Rodi's financial responsibility was indeed false. In light of the above, this court concludes that the bankruptcy court made a plausible finding that this statement was false as well.[10]

■ In the alternative, Rodi argues that, even though this last statement may have been false, like the misrepresentation in *In re Buttendorf*, it cannot be the basis for fraud under § 523(a)(2) because it is a statement about the future. *Trumbull Bldg. Ctr., Inc. v. Buttendorf (In re Buttendorf)*, 11 B.R. 558 (Bankr.D.Vt.1981). In *Buttendorf*, the bankruptcy court adopted Vermont law and held that a debtor's promise that funds would be available in the future to cover the debtor's outstanding checks was not a fraudulent statement, even though it was false. *Id.* at 562. In making this argument, Rodi has chosen to cite the law of the District of Vermont rather than the Northern District of Illinois. In *In re Horwitz* the bankruptcy court held differently: "Debtor also argues that the representation concerning the ... check is insufficient under Section 523 be-

---

9. Mahaffey testified that Rodi never informed Bombardier of Rodi's transfer of assets to his family. (Tr. 223). However, Rodi claims that he eventually did notify Bombardier of the transfer of assets. (Rodi's Reply Brief 7).

10. Rodi also asserts that this statement cannot be false because "[s]ubsequent conduct contrary to a former representation by the debtor does not necessarily establish the original representation to have been false." (R. Br. 18) (citing *Green v. Geyen (In re Geyen)*, 11 B.R. 70, 73 (Bankr.

W.D.La.1981)). Rodi has ignored the general context of the quote. The *Geyen* court was merely, yet importantly, stating that the plaintiff must also prove the other elements of fraudulent misrepresentation under § 523(a)(2), i.e. intent to deceive. *See Geyen*, 11 B.R. at 72–73. As discussed below, the bankruptcy court also made plausible findings that Rodi's misrepresentations were made with intent to deceive, and that Bombardier reasonably relied on Rodi's statements.

cause it relates to future conduct. This Court does not agree. The Court interprets a representation that an overdraft will be covered as one within the ambit of Section 523(a)(2)(A)." *Microtech Int'l, Inc. v. Horwitz (In re Horwitz)*, 100 B.R. 395, 402 (Bankr.N.D.Ill.1989) (citing *In re Nahas*, 92 B.R. 726, 731 (Bankr.E.D.Mich.1988)). A false statement is a false statement. The mere fact that a statement relates to future conduct does not immunize it from a finding of falsity under either 523(a)(2)(A) or (B). Accordingly, this court finds that Rodi's "*Buttendorf* argument" is without merit.

Based on Rodi's prior intent to transfer assets to his family, his above written statements to Bombardier, and his subsequent transfer of Rodi Properties to his family, this court concludes that the bankruptcy court did not commit clear error in finding that Rodi made false statements within the meaning of § 523(a)(2)(B).

### Intent to Deceive

■ Rodi's third argument is that the bankruptcy court committed clear error in finding that Rodi made his representations with an intent to deceive. The bankruptcy court found that, even before Rodi made the false statements above, he intended to transfer his interest in Rodi Properties to his wife and children. (Tr. 398). Considering that Rodi did indeed transfer this interest to his family less than one month after making the representations in the application for financing, the bankruptcy court found that Rodi made the representations with "a reckless disregard of the truth that is necessary for our businesses to operate." (Tr. 398).

Where "a person knowingly or recklessly makes a false representation which the person knows or should know, will induce another to make a loan, intent to deceive may logically be inferred." *Carini v. Matera*, 592 F.2d 378, 380 (7th Cir.1979). In this case, the bankruptcy court found that Rodi recklessly made the above representations to

Bombardier. The bankruptcy court noted that Rodi was an experienced business person who was familiar with the operations of high finance. (Tr. 399). In addition, Rodi admits that, at the time he made the above representations to Bombardier, he intended to transfer his interest in Rodi Properties to his family. Then he actually transferred his interest to them the following month. Considering the materiality of Rodi Properties to Rodi's financial statements as a whole, Rodi should have known that Bombardier may not have provided Lighthouse Marine with financing if Bombardier would have been informed of Rodi's intent to transfer the asset.

Rodi asserts, however, that "[a]t best", the evidence shows an *inchoate*, indefinite intention by Rodi to transfer assets to his family, not an intent to deceive Bombardier. (R. Br. 22). This argument would be more persuasive if Rodi had not made other material misrepresentations—for example, that there were no lawsuits pending against Lighthouse Marine—and if Rodi had not transferred his largest asset to his family less than one month after obtaining the financing. Rodi's assertion of benign estate planning fails to overcome the natural inferences arising from these facts. *See Hardwick Bank & Trust Co. v. Brown (In re Brown)*, 32 B.R. 554, 557 (Bankr.E.D.Tenn.1983).[11] Accordingly, the court concludes that the bankruptcy court did not commit clear error in finding that Rodi made his false representations with an intent to deceive.

### Reasonable Reliance

■ Rodi's final argument is that the bankruptcy court committed clear error in holding that Bombardier reasonably relied on Rodi's statements. In so holding, the bankruptcy court first found that Bombardier would not have entered into the financing agreement without Rodi's personal guarantee. (Tr. 396). The court further found that Bombardier would not have provided financ-

11. Rodi cites this case as supporting his position that his failure to advise Bombardier of his transfers to his wife did not give rise to nondischargeability. However, the *Brown* decision does not support Rodi's position at all. The *Brown* court held that the debtor's "representations in his

financial statement were 'continuing' in character, and the debtor had a duty to advise the Bank of any significant change in his financial condition." *Brown*, 32 B.R. at 558. Accordingly, the court found that the debt was nondischargeable under § 523(a)(2)(B). *Id.*

ing if it had known either that Rodi intended to transfer his interest in Rodi Properties to his family or that Lighthouse Marine was the defendant in a foreclosure suit. (Tr. 222–24). Finally, the bankruptcy court found that Bombardier had investigated many of the statements that Rodi had set forth in his materials. (Tr. 399–400). Accordingly, the bankruptcy court concluded that Bombardier reasonably relied on Rodi's representations.

Conceding that Bombardier may have relied on his written statements, Rodi challenges the reasonableness of the reliance. Rodi's main argument is that Bombardier's reliance was unreasonable because Bombardier did not make or request a search of public records to determine Lighthouse Marine's involvement in lawsuits. The court concludes that, in light of Bombardier's other investigative efforts, this fact alone does not render Bombardier's reliance unreasonable.

"To measure the reasonableness of a creditor's reliance ... we must look at the particular facts and circumstances of any given case." *Harasymiw*, 895 F.2d at 1173. In this case, a regional sales manager from Bombardier, Hebert, testified that he reviewed a credit report of Lighthouse Marine and consumer credit reports of all of the corporate officers involved with Lighthouse Marine. (Tr. 144). He also conducted credit checks on other companies that were doing business with Lighthouse Marine. (Tr. 143). In addition, he checked to see if Lighthouse Marine was a corporation in good standing with the State of Illinois. (Tr. 145). Hebert then prepared a report summarizing his findings. (Tr. 147). Moreover, the national sales manager from Bombardier, Mahaffey, conducted a second level of review by check-

ing and approving the report prepared by Hebert. (Tr. 218). This was in accord with Bombardier's customary review procedures. (Tr. 220–25).

"[I]t is not the court's duty ... to second guess a creditor's decision to make a loan or to set loan policy for the creditor." *Northern Trust Co. v. Garman (In re Garman)*, 643 F.2d 1252, 1258 (7th Cir.1980), *cert. denied sub nom. Garman v. Northern Trust Co.*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981); *see also Harasymiw*, 895 F.2d at 1174 ("[The court] does not sit as an after-the-fact loan committee, second-guessing lending decisions.") The court must only determine if the creditor's reliance was reasonable. *See* § 523(a)(2)(B). In this case, Bombardier followed its customary procedures in an attempt to verify many material representations made by Rodi. In light of these facts, this court cannot find that the bankruptcy court's finding of reasonable reliance amounted to clear error.

### *Conclusion*

For the foregoing reasons, the court affirms the bankruptcy court's decision that Rodi's debt to Bombardier is nondischargeable under § 523(a)(2)(B) of the Bankruptcy Code.[12] Accordingly, the court affirms the bankruptcy court's judgment against Rodi in the amount of $146,835.21 plus interest.

---

12. The court's affirmance of the bankruptcy court's finding of nondischargeability under subsection (B) makes it unnecessary for the court to address Rodi's arguments as they apply to subsection (A).